UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALEX DAY,

          Plaintiff,

    v.

JOSH VIVET., *et al.*,

          Defendants.

Case No. C10-1523RSL

ORDER DENYING PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT AND
GRANTING DEFENDANTS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT

      This matter comes before the Court on plaintiff's "Motion For Partial Summary Judgment," Dkt. # 42, and "Defendants' Motion For Partial Summary Judgment," Dkt. # 57. On July 6, 2008,[1] Tukwila Police Officer Josh Vivet used OC (pepper) spray on Alex Day while arresting him for Obstructing a Public Officer, a misdemeanor offense. Plaintiff Alex Day brought this 42 U.S.C. § 1983 action against Tukwila police officers

---

[1] There are inconsistencies in the record as to the date of plaintiff's arrest. Defendants assert that plaintiff arrived at the street races in the late evening of July 5, 2008, Dkt. # 47 at 3, with the subsequent arrest occurring on the morning of July 6, Dkt. # 9 at 2. Plaintiff avers as an undisputed fact that "[i]n the early morning hours of July 6, 2008, Mr. Day . . . went . . . to watch other persons engage in street car races," Dkt. # 42 at 3, but states the arrest did not take place until July 8, 2008, id. at 1. Based on the Tukwila Police Department arrest log and booking sheet, Dkt. # 44, Ex. 7 at 2–3, the depositions of Officers Vivet and Eric DeVries, id., Exs. 2 at 18–19, 4 at 6, deposition testimony of Alex Day, Dkt. # 48 at 6–7**,** and both parties' general account of the events, the Court concludes that the street race occurred in the late evening of July 5, 2008 with the arrest taking place in the early morning hours of July 6. This fact, however, is not important for resolution of this motion.

in their individual capacity and the City of Tukwila alleging that the use of pepper spray and the failure to wash the spray from his face violated the Fourth Amendment's prohibition against excessive force. Plaintiff also asserts that officers lacked probable cause to arrest him resulting in Fourth Amendment and state law violations. Finally, plaintiff claims the officers wrongfully assaulted him during the arrest.

Plaintiff moves for partial summary judgment asking the Court to hold that, as a matter of law, defendants' conduct violated plaintiff's constitutional rights and that qualified immunity does not shield defendants' actions from liability. Defendants also move for partial summary judgment asking the Court to dismiss plaintiff's (1) Fourth Amendment claim for arrest without probable cause and state law claims for false arrest and malicious prosecution, (2) federal civil rights claims for failure to wash the pepper spray from plaintiff's face, and (3) all claims against Officers Ken Hernandez and Eric DeVries.

Summary judgment is appropriate when there is no genuine dispute of material facts and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The moving party bears the initial burden of justifying the basis for its motion, Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986), and identifying materials in the record that show the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). A genuine dispute of material fact arises when there "is enough [evidence] 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" Aydin Corp. v. Loral Corp., 718 F.2d 897, 902 (9th Cir. 1983) (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). In making this determination, a court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

1    If the moving party meets its initial burden, then the non-moving party must

2    designate, from evidence in the record, "specific facts showing that there is a genuine

3    issue for trial." <u>Celotex</u>, 477 U.S. at 324.  Production of a "mere . . . scintilla of

4    evidence" is not sufficient to prevent summary judgment.  <u>Anderson v. Liberty Lobby,</u>

5    <u>Inc.</u>, 477 U.S. 242, 252 (1986).  Rather, "there must be evidence on which the jury could

6    reasonably find for the [non-moving party]."  <u>Id.</u>

7    Having considered the pleadings, declarations,[2] and exhibits submitted by the

8    parties, the Court finds as follows:

9                              **FACTUAL BACKGROUND**

10   Plaintiff attended a late night street car race in a business park in Tukwila,

11   Washington on July 5, 2008.[3]  While at the illegal street car race, Justin Teel, a friend of

12   the plaintiff, was involved in a hit-and-run accident.  Dkt. # 42 at 4.  Mr. Teel's vehicle

13   struck another car causing damage to both vehicles.[4]  <u>Id.</u>  Plaintiff, with his friends Mr.

14   Teel and Jason Geist, fled the scene of the accident when they heard shouts of "cops."

15   Dkt. # 48 at 10–11.  They parked Mr. Teel's damaged vehicle and Mr. Geist's car behind

16   a building in a loading dock area.  Dkt. # 48 at 11; Dkt. # 47 at 4.  Plaintiff and his two

17   friends then climbed up and hid on top of two semi-truck trailers in an attempt to elude

18   the police.  Dkt. # 42 at 4; Dkt. # 47 at 4.

19   While on a routine patrol just after midnight on July 6, 2008, Officer Ken

20   Hernandez came upon the street race.  Dkt. # 44, Ex. 8 at 7.  A person near a vehicle

---

21

22   [2] The Court did not consider the declarations of Bob Bragg, Dkt. # 50, or Donald Van
     Blaricom, Dkt. # 45, in making this decision.  Therefore, the Court need not address plaintiff's

23   earlier motion to strike Mr. Bragg's declaration, Dkt. # 52 at 6–7, or defendants' motion to strike
     Mr. Blaricom's, Dkt. # 47 at 9–10.

24
     [3]<u>See</u> <u>supra</u> note 1.
25
     [4] The record is unclear as to whether the hit-and-run resulted in any injuries to the
26   passengers of either car.  Dkt. # 44, Ex. 2 at 11; Dkt. # 42 at 4.

with "major front-end damage" flagged the officer down and explained "he had just been hit and run by another vehicle." Dkt. # 44, Ex. 8 at 7; Dkt. # 47 at 4. Officer Hernandez called for officers to assist and held his position blocking the only road into the business park. Dkt. # 44, Ex. 8 at 7; Dkt. # 47 at 4. Officer Vivet responded to the call and arrived on the scene less than one half-hour later. Dkt. # 44, Ex. 2 at 10. After talking with Officer Hernandez, Officer Vivet conducted a search for the suspect vehicle involved in the accident. Id., Ex. 2 at 10. Officer Vivet quickly located the vehicle and radioed for assistance. Id., Ex. 2 at 10; Dkt. # 47 at 4–5. Soon thereafter, Officer DeVries from the K-9 unit arrived with his canine partner. Dkt. # 44, Exs. 2 at 11, 4 at 6; Dkt. # 42 at 4.

Officer DeVries described the loading dock where plaintiff and his friends were hiding as having "[a]mbient street lighting, but minimal, very dark." Dkt. # 44, Ex. 4 at 7. According to Officer Vivet, "The lighting was horrible in the area we were in." Dkt. # 44, Ex. 2 at 13. Plaintiff does not dispute the officers' descriptions of the loading dock. Officer DeVries' canine partner indicated that the suspects might be located on top of the trailers. Dkt # 44, Ex. 4 at 6. When Officer DeVries shined his flashlight in that direction he "saw a head appear." Dkt. # 47 at 5. Officer Vivet ordered that suspect, plaintiff, to show his hands and come down from the trailer. Dkt # 44, Ex. 2 at 11. While ordering plaintiff off the trailer, Officers Vivet and DeVries noticed the other two suspects on top of trailers.[5] Id., Ex. 2 at 11.

Plaintiff would not come down from the trailer, but instead yelled at Officer

_____

[5] The record is unclear as to the precise locations of the suspects when ordered to come down from the trailers. In his deposition, Officer Vivet testified that he first located plaintiff atop a trailer and ordered him to come down. Dkt. # 44, Ex. 2 at 11. While ordering plaintiff down, Officer Vivet noticed the other two suspects on top of a separate trailer. Id., Ex. 2 at 11. Officer DeVries' recollection of the suspects' locations seems to conform with Officer Vivet's account. Id., Ex. 4 at 7–8. Plaintiff testified in deposition that he hid atop a trailer with Mr. Teel. Dkt. # 48 at 13. The pleadings fail to clarify this point.

DeVries, "Get that 'F–ing' dog away from me." Id., Ex. 2 at 11; Dkt. # 42 at 5. With the dog barking and on a leash, Officer DeVries backed up to a distance of thirty to forty feet away from plaintiff's trailer. Dkt. # 44, Ex. 4 at 7; Dkt. # 52 at 2. Plaintiff and Officer Vivet continued to yell at one another with the officer ordering plaintiff to show his hands and come off the truck. Dkt. # 44, Ex. 4 at 7–8. Officer Vivet described plaintiff as "very defiant," id., Ex. 2 at 11, while plaintiff contends that he did not immediately come down from the trailer because he was "afraid of Officer DeVries' police dog." Dkt. # 52 at 2. Officer Vivet used profanity while ordering plaintiff off the trailer. Dkt # 42 at 5; Dkt. # 44, Ex. 2 at 12.

Within approximately thirty to forty-five seconds from when Officer Vivet first ordered plaintiff off the trailer, plaintiff began to climb down. Dkt. # 42 at 6; Dkt. # 47 at 5. While climbing down, plaintiff said to Officer Vivet, "'You can't talk to me like I am a little bitch,' or words to that effect . . . ." Dkt. # 42 at 5–6. Officer Vivet could not see plaintiff as he descended "between the loading dock and rear of the truck . . . ." Dkt. # 47 at 5–6; Dkt. # 44, Ex. 2 at 12. Defendants contend plaintiff refused to come out from behind the trailer "despite repeated commands from Officer Vivet." Dkt. # 47 at 5. Plaintiff disputes this contention, asserting he "was in the process of climbing down from the top of the boxcar in response to Officer Vivet's order . . . ." Dkt. # 52 at 2.

With plaintiff behind the truck trailer, either still in the process of climbing down or standing on the loading dock platform, Officer Vivet decided to use his pepper spray. Id. at 6; Dkt. # 42 at 7. The officer sprayed the area between the trailer and wall, Dkt. # 44, Ex. 2 at 12, and succeeded in spraying plaintiff in the face with the pepper spray. Dkt. # 42 at 6–7. Plaintiff then came out from behind the trailer as ordered by Officer Vivet. Id. at 8. A search of plaintiff revealed he was unarmed, and at no point did he physically assault or attempt to make contact with the officers. Dkt. # 44, Ex. 2 at 14;

Dkt. # 42 at 8.

According to the deposition testimony of Officer Vivet, the entire situation up to this point "was extremely tense." Dkt. # 44, Ex. 2 at 13. He "worried" that plaintiff's recalcitrance might be a "distraction technique" to set up an "ambush" as the other "two suspects [got] off a truck" behind the officer. Id., Ex. 2 at 13. Officer Vivet explained he did not know if the suspects were armed and "always assumes that until it's proven otherwise." Id., Ex. 2 at 12. Officer DeVries also described the events as "very tense." Id., Ex. 4 at 7.

After coming out from behind the trailer as ordered, plaintiff followed Officer Vivet's command to get on the ground. Dkt. # 47 at 6. Officer Vivet handcuffed plaintiff and placed him in the back of his patrol car. Id. Plaintiff remained in the patrol car for approximately ten minutes before Officer Vivet drove him, and Mr. Teel, to the Tukwila holding center. Id. at 6–7; Dkt. # 42 at 9. The drive to the holding center took about twenty minutes, whereupon arriving Officer Vivet placed plaintiff in a cell. Dkt. # 47 at 6–7; Dkt. # 42 at 9. Despite plaintiff's complaints concerning the pain caused by the pepper spray, no police officer made any effort to wash or wipe the spray from plaintiff's face. Dkt. # 42 at 8–9; Dkt. # 44, Ex. 2 at 18. Plaintiff's holding cell contained a sink where he attempted to wash his face, approximately thirty minutes after his initial exposure to the pepper spray. Dkt. # 42 at 10–11; Dkt. # 47 at 7. Plaintiff received no assistance decontaminating himself while at the Tukwila holding center. Dkt. # 42 at 10–11.

General Order 1 of the Tukwila Police Department states, in part:

> Officers will receive training in the use of OC and its effects prior to carrying OC. OC will not be used against a handcuffed suspect unless the suspect still presents a threat to the safety of officers, themselves, or others. As soon as practical, cool water should be used to rinse the contaminated area of any person who has come in contact with OC.

Dkt. # 44, Ex. 5 at 2. Officers Vivet, DeVries, and Hernandez all received training in the

use of pepper spray. Id., Exs. 2 at 4, 4 at 4, 8 at 4. While Officers Vivet and DeVries stated they had never washed the face of an individual they sprayed with pepper spray, Id., Exs. 2 at 7, 4 at 5, Officer Hernandez explained he once called the fire department to "render aid to the suspect's face [by] wash[ing] the [pepper] spray off." Id., Ex. 8 at 5.

A Tukwila Fire Department engine also responded to the hit-and-run accident in order to provide medical assistance to any potential victims. Dkt. # 42 at 13. Passengers of the stricken car refused aid. Id. The record supports plaintiff's contention, and defendants do not dispute, that Officer Vivet likely passed the engine and firefighters while transporting plaintiff to the holding cell. Id. at 14. Firefighters have in the past provided aid to individuals exposed to police pepper spray. Id.; Dkt. # 44, Ex. 10 at 8, 12.

The City of Tukwila charged plaintiff with the misdemeanor crime of Obstructing a Public Officer, but dismissed the charge before trial. Dkt. # 42 at 12. Plaintiff then brought this 42 U.S.C. § 1983 suit against the officers in their individual capacity and the City of Tukwila, as well as state law claims for false arrest, false imprisonment, malicious prosecution, and assault and battery.

**DISCUSSION**

I.    FOURTH AMENDMENT CLAIM FOR ARREST WITHOUT PROBABLE CAUSE AND STATE LAW CLAIMS FOR FALSE ARREST AND MALICIOUS PROSECUTION

Section 1983 provides a remedy for arrests executed without probable cause in violation of the Fourth Amendment. Dubner v. City & Cnty. of S.F., 266 F.3d 959, 964 (9th Cir. 2001). However, "[p]robable cause to arrest is . . . an absolute defense to any claim under § 1983 against police officers for wrongful arrest . . . as the lack of probable cause is a necessary element . . . ." Lacy v. Cnty. of Maricopa, 631 F. Supp. 2d 1183, 1193 (D. Ariz. 2008) (citing Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006)); see Smith v. Almada, 640 F.3d 931, 944 (9th Cir. 2011) (Gwin, J., concurring)

(explaining probable cause acts as an absolute defense to both false arrest and malicious prosecution claims). Similarly, under Washington law, probable cause provides a complete defense against claims of false arrest and malicious prosecution. See Hanson v. City of Snohomish, 121 Wn. 2d 552, 563 (1993) ("As with an action for malicious prosecution, probable cause is a complete defense for false arrest and imprisonment."). Thus, if defendants had probable cause to arrest plaintiff, then plaintiff's claims of arrest without probable cause, false arrest, and malicious prosecution all fail.

A.  Federal Standard for Probable Cause

"The test for whether probable cause exists is whether at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005) (citation omitted) (internal quotation marks omitted). In assessing whether probable cause exists, the Court must consider "'the totality of the circumstances known to the arresting officer (or within the knowledge of the other officers at the scene) . . . .'" Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007) (quoting Dubner, 266 F.3d at 966). "Because probable cause must be evaluated from the perspective of prudent [people] not legal technicians, an officer need not have probable cause for every element of the offense." Gasho v. United States, 39 F.3d 1420, 1428 (9th Cir. 1994) (internal citations omitted) (internal quotation marks omitted). "However, when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." Id. (citing Kennedy v. L.A. Police Dep't, 901 F.2d 702, 705 (9th Cir. 1989)).

B.  Elements of Obstructing an Officer under Washington Law

The City of Tukwila charged plaintiff with obstructing a law enforcement officer

under RCW 9A.76.020.  Dkt. # 44, Ex. 9.  The statute provides that "[a] person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties."  RCW 9A.76.020(1).  "The crime of obstructing an officer has four essential elements: 1) an action or inaction that hinders, delays, or obstructs the officers; 2) while the officers are in the midst of their official duties; 3) the defendant knows the officers are discharging a public duty; 4) the action or inaction is done knowingly."  Lassiter v. City of Bremerton, 556 F.3d 1049, 1053 (9th Cir. 2009); see State v. Contreras, 92 Wn. App. 307, 315–16 (1998) (citing State v. CLR, 40 Wn. App 839, 841–42 (1985)).  Under Washington law, "[t]he established rule is that flight constitutes obstructing, hindering, or delaying[.]"  State v. Hudson, 56 Wn. App. 490, 497 (1990); see also State v. Little, 116 Wn.2d 488, 496 (1991) (holding that the defendant's "refusal to stop when instructed to do so and his attempt to elude [an officer] by running into an apartment building and closing the door in the face of an officer constituted an obstruction of a police officer in the execution of his official duties").

C. Officer Vivet Had Probable Cause to Arrest Plaintiff for Obstructing an Officer

On the night of his arrest, plaintiff attended illegal street car races with three friends.  As he explained in his deposition, "We were in the industrial areas of Tukwila . . . watching illegal street racing."  Dkt. # 48 at 6.  While at the races, plaintiff's friend, Justin Teel, "was involved in a hit-and-run accident with another vehicle."  Dkt. # 42 at 4.  Plaintiff went to check on his friend at the scene of the collision.  Dkt. # 48 at 10.  He then "heard someone yell cops," id., and "grabbed Justin's bumper . . . put it in his car and just got in the car with Justin," id. at 11.  Fleeing the police, plaintiff and his friends drove their cars to a loading dock and then proceeded to climb atop the truck trailers, id. at 12, where they were soon discovered by Officers Vivet and DeVries.  Dkt. # 42 at 4.

These actions alone suffice to provide the officers with probable cause to arrest plaintiff. Responding to reports of illegal street racing and investigating a hit-and-run accident, Officers Vivet and DeVries located three young men hiding on top of trailers in a dimly lit loading dock. Examining the elements of the charged crime, it is clear that the officers were "in the midst of their official duties" and that "the defendant [knew] the officers [were] discharging a public duty . . . ." See Lassiter, 556 F.3d at 1053; RCW 9A.76.020(1). The plaintiff's actions certainly "hinder[ed]" and "delay[ed]" the officers conducting the investigation of the hit-and-run accident. See Lassiter, 556 F.3d at 1053; RCW 9A.76.020(1). Finally, plaintiff admits he knowingly fled the scene of an accident with his friends in order to avoid police detection. See Lassiter, 556 F.3d at 1053; RCW 9A.76.020(1). Plaintiff's actions meet the statutory elements of obstructing an officer. In considering the "facts and circumstances" known to Officers Vivet and DeVries, see Jensen, 425 F.3d at 704, the Court finds the officers had probable cause to arrest plaintiff for violating RCW 9A.76.020.

Plaintiff's obstructionist actions are not limited to his flight from law enforcement. Upon discovery by police, plaintiff refused to comply with Officer Vivet's commands to show his hands and come down from the trailer. Instead, plaintiff yelled at Officer DeVries, "'Get that f–king dog away from me. Get that f–king dog on a leash.'" Dkt # 42 at 5. Officer DeVries backed away with his police dog and "[a]fter Officer Vivet kept telling [plaintiff] to show his hands and climb down," plaintiff then "began to climb down from the top of the truck." Id. While climbing down, plaintiff told Officer Vivet, "'You can't talk to me like I am a little bitch,' or words to that effect . . . ." Id. at 5–6. Even if plaintiff was afraid of Officer DeVries' police dog, Dkt. # 52 at 2, that does not excuse his refusal to show his hands. The officers were attempting to secure a situation unfolding in a poorly lit loading dock with an unknown number of suspects hiding on truck trailers. Plaintiff's actions after contact with police also provide

probable cause that he "willfully hinder[ed], delay[ed, and] obstruct[ed]" officers

conducting an investigation and attempting to ensure their safety.  See

RCW 9A.76.020(1).[6]

Viewing the facts and all reasonable inferences in the light most favorable to

plaintiff, the Court finds that the arresting officers had probable cause to believe he

violated RCW 9A.76.020.  Therefore, plaintiff's Fourth Amendment claim of arrest

without probable cause and state law claims of false arrest and malicious prosecution are

dismissed with prejudice.

## II.     INITIAL APPLICATION OF PEPPER SPRAY BY OFFICER VIVET

Section 1983 of the Civil Rights Act of 1964 provides a cause of action against

persons acting under the color of law who deprive citizens of their constitutional or

federal statutory rights.  42 U.S.C. § 1983; Monell v. Dep't of Soc. Servs., 436 U.S. 658,

691–92 (1978).  Police officers who violate a suspect's rights may still be entitled to

immunity from money damages if their discretionary actions did not violate clearly

established law.  See Anderson v. Creighton, 483 U.S. 635, 640 (1987) (holding that

qualified immunity will protect official action unless "in the light of pre-existing law the

unlawfulness [is] apparent").

All parties agree that the officers acted in their official capacities and, thus,

"under the color of law" when arresting plaintiff.  Plaintiff's summary judgment motion

asks the Court to rule, as a matter of law, that Officer Vivet's decision to deploy pepper

spray violated plaintiff's Fourth Amendment rights and qualified immunity does not

protect the officer's actions.  Taking "all reasonable inferences supported by the

---

[6] Even if the undisputed facts did not clearly establish probable cause for plaintiff's arrest, this case would exemplify the "'many situations which confront officers in the course of executing their duties [that] are more or less ambiguous [and require] room for some mistakes on their part.'"  McSherry v. City of Long Beach, 584 F.3d 1129, 1135 (9th Cir. 2009) (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).

evidence in favor of" defendants, see Villiarimo, 281 F.3d at 1061, the Court finds that genuine issues of fact remain relevant to determining the reasonableness of the officer's actions under these specific circumstances. See Graham v. Connor, 490 U.S. 386, 396 (1989).

A.    Excessive Force under the Fourth Amendment

In determining whether the officers used excessive force in violation of the Fourth Amendment, the Court "must assess whether [their actions were] objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'" Gregory v. Cnty. of Maui, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting Graham, 490 U.S. at 397) (latter alteration in original). The Court must carefully balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" Id. (quoting Graham, 490 U.S. at 396). Because this balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002).

1.    Nature of the intrusion

Officers' use of pepper spray constitutes a serious intrusion under the Fourth Amendment. See Young v. Cnty. of Los Angeles, 655 F.3d 1156, 1161–62 (9th Cir. 2011) (holding pepper spray constituted a significant intrusion under the Graham analysis); Headwaters Forest Def. v. Cnty. of Humboldt, 276 F.3d 1125, 1130–31 (9th Cir. 2002) (holding officers used excessive force when they sprayed pepper spray into the faces of non-violent protestors, applied pepper spray to protestors' eyes using a Q-tip, and refused to wash the spray out of their eyes). Therefore, Officer Vivet's deployment of pepper spray in plaintiff's face resulted in a serious Fourth Amendment intrusion.

2.    Government interest

The Court considers three "core factors" in assessing the government's interests: (1) the severity of the crime; (2) whether plaintiff posed an immediate threat to the officers or others; and (3) whether he actively resisted arrest.  Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010).  These factors are not exclusive.  Id.  Instead, a court must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in Graham.'"  Id. (quoting Franklin v. Foxworth, 31 F.3d 873, 876 (9th Cir. 1994)).

a.    Applying the Graham factors

Under the Graham test, the most important factor is "whether the suspect poses an immediate threat to the safety of the officers or others."  Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994).  Here, two officers encountered three suspects hiding atop truck trailers in a dimly lit loading dock.  One suspect, plaintiff, refused to show his hands and come down from the trailer despite direct orders from Officer Vivet.  The suspect swore and yelled at the officers saying at one point, "You can't talk to me like I am a little bitch."  Dkt. # 42 at 5–6.  Plaintiff disappeared from the officers' view when he came down from the trailer.  According to defendants, plaintiff did not immediately emerge from behind the trailer despite repeated commands from Officer Vivet.  Rather than go behind the trailer himself, exposing himself to unknown risks, the officer used pepper spray.  Thus, for purposes of plaintiff's summary judgment motion, the undisputed facts and reasonable inferences drawn therefrom in favor the defendants raise serious concerns regarding officer safety and plaintiff's efforts to elude law enforcement and resist arrest.

3.    Balancing the governmental interest against the nature of the intrusion

Spraying pepper spray in plaintiff's face resulted in a "significant intrusion upon [his] liberty interests."  See Young, 655 F.3d at 1166.  However, taking the facts in the light most favorable to defendants, a jury could find Officer Vivet's use of pepper spray

objectively reasonable under the circumstances to ensure officer safety and in response to plaintiff's delay in surrendering to police. The record is unclear as to exactly how long plaintiff took in emerging from behind the trailer, whether he was still in the act of climbing down when sprayed, and if plaintiff intentionally refused to show himself as ordered by the officer. Given the totality of the circumstances and taking all facts and inferences in the light most favorable to the officers, the Court cannot say the officer's use of pepper spray under these circumstances constituted objectively unreasonable behavior as a matter of law. See Bryan, 630 F.3d at 826.

III. FAILURE TO RINSE PLAINTIFF'S EYES AFTER SPRAYING HIM WITH PEPPER SPRAY

Both plaintiff and defendants' move for summary judgment on the claim that the officers exercised excessive force in failing to immediately wash plaintiff's face after spraying him with pepper spray. Allowing the pepper spray to remain on plaintiff's face for approximately thirty minutes resulted in a serious governmental intrusion of his Fourth Amendment rights. See Headwater, 276 F.3d at 1130–31; LaLonde v. Cnty. of Riverside, 204 F.3d 947, 961 (9th Cir. 2000). However, the Court need not engage in the Graham multi-factored balancing test to determine whether delaying immediate treatment for pepper spray constitutes a constitutional violation under these circumstances, because the law in this area was not clearly established at the time of the challenged action.

A. Qualified Immunity

Qualified immunity "is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" Pearson v. Callahan,

555 U.S. 223, 231 (2009) (quoting <u>Mitchell</u>, 472 U.S. at 526). Therefore, the United States Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" <u>Id.</u> at 232 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (<u>per curium</u>)).

The doctrine of qualified immunity protects "federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." <u>Ashcroft v. al-Kidd</u>, 563 U.S. —, 131 S. Ct. 2074, 2080 (2011) (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Courts are not required to analyze the two prongs in any particular order. <u>Id.</u>

Determining whether an official's actions violated clearly established law "turns on the 'objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.'" <u>Pearson</u>, 555 U.S. at 244 (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 614 (1999)). Qualified immunity serves "'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" <u>Stoot v. City of Everett</u>, 582 F.3d 910, 922 (9th Cir. 2009) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002)). However, "'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" <u>Young</u>, 655 F.3d at 1167 (quoting <u>Hope</u>, 536 U.S. at 741)). As the Supreme Court explained in <u>United States v. Lanier</u>,

> "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'"

520 U.S. 259, 271 (1997) (quoting <u>Anderson</u>, 483 U.S. at 640) (alteration in original) (citation omitted)). Simply put, the law at the time of the challenged conduct must have been clear enough to provide officials with "fair warning that their alleged treatment of

1  [the plaintiff] was unconstitutional . . . ." Hope, 536 U.S. at 741.

2     B.    The Officers' Decision to Delay Washing the Pepper Spray from
             Plaintiff's Face Until Returning to the Holding Center Did Not Violate
3             Clearly Established Law

4        Qualified immunity protects Officers Vivet and DeVries from liability if their

5  actions did not violate clearly established law.  Liability can only be found if the case

6  law gave them fair warning that transporting plaintiff back to the police station from his

7  place of arrest, without immediately washing the pepper spray from his face, constituted

8  excessive force.  Because the constitutional law in this area was not clearly established

9  and failed to provide the officers with the requisite fair warning, qualified immunity

10 protects the officers from liability for not immediately washing plaintiff's face after

11 spraying him with pepper spray.

12        1.    Case law at the time of plaintiff's arrest

13        In LaLonde v. County of Riverside, an officer used pepper spray on a suspect

14 who resisted arrest.  204 F.3d at 951–52.  The arresting officers, after handcuffing and

15 sitting the suspect on a couch in his apartment, offered no aid to the suspect "[f]or twenty

16 to thirty minutes . . . ."  Id. at 952.  Although the arresting officer testified that he

17 received training "that, after spraying someone, [the officer] should take all possible

18 steps to assist them, such as splashing water to flush out the person's eyes," id., the

19 suspect sat with the pepper spray on his face until two other officers arrived and

20 "[a]lmost immediately [used] a wet dish towel from the kitchen and wiped [the

21 arrestee's] face," id.  The court held that the use of pepper spray "may be reasonable as a

22 general policy to bring an arrestee under control, but in a situation in which an arrestee

23 surrenders and is rendered helpless, any reasonable officer would know that a continued

24 use of the weapon or refusal without cause to alleviate the harmful effects constitutes

25 excessive force."  Id. at 961 (emphasis added).

26        Headwaters Forest Defense v. County of Humboldt involved an excessive force

claim by non-violent protestors against police. 276 F.3d at 1127. On several occasions, protestors had linked themselves together using steel bracelets and metal cylinders. Id. at 1127–29. When police arrived some protestors refused to disengage the bracelets. Id. at 1128–29. Police sprayed pepper spray into the faces of the protestors and applied pepper spray to protestors' eyes using Q-tips. Id. Officers sometimes "threatened . . . not [to] provide the protestors with water to wash out their eyes until they released themselves . . . ." Id. at 1131. On one occasion officers refused to "provide the protestors with water for over twenty minutes." Id. The Ninth Circuit held that "[s]praying the protestors with pepper spray and then allowing them to suffer without providing them water is clearly excessive under the circumstances." Id. (emphasis added).

> 2. <u>LaLonde</u> and <u>Headwaters</u> do not clearly establish a broad constitutional rule requiring officers to immediately wash an arrestee's face after using pepper spray irrespective of the conditions and location of arrest

The officers' conduct in this case need not be "'fundamentally similar'" to the prohibited actions in <u>LaLonde</u> and <u>Headwaters</u> for plaintiff to defeat the qualified immunity defense. <u>See</u> <u>Hope</u>, 536 U.S. at 741 (quoting <u>Lanier</u>, 520 U.S. at 269–70). However, unless those earlier cases provided defendants with fair warning that their actions constituted excessive force, then qualified immunity applies and plaintiff's claim must be dismissed. <u>See id.</u> Neither the holdings of <u>LaLonde</u> nor <u>Headwater</u> served to notify Officers Vivet and DeVries that their actions violated plaintiff's Fourth Amendment rights.

Here, police first arrived on the scene—an industrial area in the early morning hours—in response to reports of illegal street car racing. Upon discovering a vehicle involved in a hit-and-run accident, Officer Hernandez called for back-up. Officer Vivet, along with Officer DeVries and his K-9 partner, located the hit-and-run suspects hiding

on top of trailers in a dimly lit loading dock.  These facts are a far cry from those in Headwaters where police repeatedly used pepper spray on non-violent protestors.  The officers in Headwaters, on at least one occasion, used pepper spray on the protestors and then refused them water to wash their faces as a way to punish the protestors for failing to comply with police commands.  The officers apparently possessed adequate water to treat the protestors but denied treatment for the sole purpose of making the arrestees suffer.

Unlike Headwaters, the only water alleged at the scene of plaintiff's arrest was what "Officer DeVries normally carries . . . in the patrol car for his dog."  Dkt. # 42 at 10.  Constitutional law does not clearly require that officers must use any water in their possession—including that allotted for other law enforcement purposes—to immediately wash pepper spray from an arrestee's face.

For similar reasons, LaLonde does not clearly establish that Officer DeVries must relinquish the water he carries for his K-9 partner in order to wash plaintiff's face.  First, the police officers in LaLonde arrested the plaintiff in his apartment and had ready access to a sink.  Officers Vivet and DeVries arrested plaintiff in the loading dock of an industrial area in the middle of the night.  The officers had access to a limited supply of water carried for a different law enforcement purpose.  Second, Officer Vivet transported plaintiff directly from the place of arrest to the holding cell.  The holding cell contained a sink and towels with which plaintiff could decontaminate himself.  There are no allegations that Officer Vivet delayed removing plaintiff from the scene of arrest to the holding cell.

Plaintiff also asserts that because Officer Vivet transported him to the holding cell to decontaminate, rather than to a nearby fire engine responding to the hit-and-run accident or calling the fire department to the scene of arrest to render aid, the officer violated plaintiff's clearly established Fourth Amendment right to be free from excessive

force.  The holdings in <u>LaLonde</u> and <u>Headwater</u> did not require Office Vivet to seek out nearby, potentially unsecured sources of water.  Once again, in both of those cases officers had ready access to water at the scene of arrest that could be used to wash the faces of arrestees exposed to pepper spray.  Ninth Circuit precedent does not dictate where officers must take arrestees when water for decontamination is not immediately available.

In summation, <u>LaLonde</u> and <u>Headwater</u> did not provide notice to the officers that they must carry first aid to treat injuries caused by their weapon so they could immediately wash an arrestee's face after using pepper spray.[7]  Furthermore, those cases did not clearly establish a rule requiring the officers to transport plaintiff to the nearest source of water when they could reach a secure holding cell with running water and towels within twenty to thirty minutes.  If adequate amounts of water for decontamination[8] were readily available at the scene of arrest, then <u>LaLonde</u> and <u>Headwaters</u> might well provide fair warning for purposes of overcoming qualified immunity.  That, however, is not this case.  Because Officers Vivet and DeVries did not violate clearly established law by transporting plaintiff to the holding cell for decontamination, qualified immunity applies and plaintiff's claim of excessive force for these actions is dismissed.

---

[7]  Nor is the Police Department's policy requiring officers to rinse contaminated areas with cool water as soon as practical a constitutional mandate that can give rise to liability under § 1983.  Nevertheless, the fact that two of the officers have never complied with General Order 1 should be of some concern to the Tukwila Police Department.

[8]  The Court does not speculate as to how much water would constitute an adequate amount for decontamination purposes.  Here, the only water alleged at the scene was allotted for other law enforcement purposes.

III.   CLAIMS AGAINST OFFICERS HERNANDEZ AND DEVRIES

A.     Officer Hernandez

Defendants ask the court to dismiss all claims against Officer Hernandez.  Dkt. # 57 at 2.  Plaintiff does not oppose dismissing Officer Hernandez as a defendant.  Dkt. # 59 at 4.  The Court, therefore, grants defendants' motion in regard to Officer Hernandez and dismisses him from this case.

B.     Officer DeVries

The Court has already found that Officers Vivet and DeVries had probable cause to arrest plaintiff and, therefore, dismissed the Fourth Amendment claim of arrest without probable cause and state claims of false arrest and malicious prosecution.  The Court also held that qualified immunity protects the officers from plaintiff's claim of excessive force for refusing to immediately wipe the pepper spray from his face. Counsel for plaintiff conceded in oral argument that the Fourth Amendment claim based upon Officer Vivet's initial application of pepper spray does not involve Officer DeVries. Therefore, all claims against Officer DeVries are dismissed.[9]

**CONCLUSION**

For all the foregoing reasons, plaintiff's motion for partial summary judgment (Dkt. # 42) is DENIED and defendants' motion for partial summary judgment (Dkt. # 57) is GRANTED.  The Court dismisses plaintiff's Fourth Amendment claim for arrest without probable cause, state law claims for false arrest and malicious prosecution, and

_____

[9] Plaintiff's complaint originally filed in King County Superior Court alleges "[d]efendants wrongfully assaulted and battered plaintiff during the course of the incident."  Dkt. # 1 at 14.  To the extent the claim of assault and battery rests upon the initial application of pepper spray, plaintiff's counsel conceded in oral argument that Officer DeVries was not implicated in this action.  Plaintiff does not appear to argue that failure to treat for pepper spray exposure constitutes assault and battery under Washington law.  While the complaint alleges that officers "[threw plaintiff] to the ground, and then hit [him] in ribs multiple times with a nightstick," Dkt # 1 at 8, this allegation does not appear in later pleadings and lacks any factual support in the record.

constitutional claim of excessive force for not washing pepper spray from plaintiff's face until transporting him to a holding cell. The Court dismisses all claims against Officers Hernandez and DeVries. Therefore, the only remaining triable issues are plaintiff's constitutional claim of excessive force and state law claim of assault and battery against Officer Vivet and the City of Tukwila for the initial use of the pepper spray in executing plaintiff's arrest.[10]

Dated this 1st day of June, 2012.

Robert S. Lasnik
United States District Judge

---

[10] Defendants do not request summary judgment on plaintiff's Fourth Amendment false imprisonment claim. However, the Court found defendants had probable cause to arrest plaintiff and "[p]robable cause to arrest or detain is an absolute defense to any claim under § 1983 against police officers for wrongful arrest or false imprisonment, as the lack of probable cause is a necessary element of each." Lacy, 631 F. Supp. 2d at 1193; see Smith, 640 F.3d at 944 (Gwin, J., concurring).